## ALEXANDER McEOWEN *vs.* ALVAH LEWIS.

1. In a question of boundary, a *particular* will control a *general* description in a deed, and fixed monuments will control courses and distances.

2. The doctrine of the acquisition of title by adverse possession is not in conflict with sound morals; but if a party choose to waive this defence, courts and juries do right in not enforcing it.

3. Where the issue tried resolves itself into a mere question of fact, which is properly submitted to the jury, and no complaint is made of the charge of the court, a new trial will not be granted, unless, upon a review of the facts, it clearly appears that injustice has been done.

Alexander McEowen brought an action of trespass, in this court, against Alvah Lewis, for cutting and carrying away timber from land claimed by the plaintiff. The defendant pleaded title. The cause was tried at the Somerset Circuit, in April Term, 1856, and a verdict rendered for the defendant.

On the return of the *postea* to this court, the plaintiff obtained a rule to show cause why the verdict should not be set aside, and a new trial granted.

Argued, at June Term, 1857, before the CHIEF JUSTICE and Justices ELMER, POTTS, and VREDENBURGH.

*Brown*, in support of the rule.

*Voorhees* and *Ransom*, contra.

POTTS, J. The parties own adjoining tracts of land. The dispute is where the true division line between them runs. Lewis insists it is a brook, called Longhill brook; while McEowen claims that it is an old brush fence, which it seems, for some fifty years, has answered the general purposes of a division fence between the tracts. The stream is crooked, and the brush fence nearly straight. At the *locus in quo*, the fence is north of the stream, and

the defendant crossed the fence, and cut some trees between it and the stream. For this alleged trespass, McEowen brought this action. It was tried at the Somerset Circuit, and a verdict rendered for the defendant.

The motion is to set aside the verdict, for the reasons— 1, that it is against the evidence; 2, against law; 3, against the charge of the court.

As the defendant put himself upon his title by way of justification, the *onus* was upon him to establish it.

He attempted to do so—first, from the language of the deeds; second, from the admissions of the plaintiff.

1. As to the paper title. The defendant claims through divers conveyances, tracing his title back to a deed from Gawin McCoy to Thomas Lewis, dated December 20th, 1799. In this deed the tract begins, by description, at a poplar stump by *the brook;* thence. north, *about* seventy-seven degrees ten minutes west, *along Vail's line up the brook,* twenty-four chains, &c. This is the line in controversy. The description fixes it by reference to *Vail's line.* There is nothing else definite about it; for the words "up the brook" do not bind the line to the several courses of the brook, unless Vail's line was there.

The next inquiry therefore is, where was Vail's line in 1799, when this deed was given? The Vail title, under which plaintiff claims, came through Phineas Cox, who, in May, 1762, conveyed 430 acres, embracing what is now the plaintiff's tract, to Daniel Vail. It describes the northern boundary, from the point where it strikes the brook, to where it leaves it, by particular courses and distances, which carry the line sometimes on one side and sometimes on the other side of the brook, which is quite a crooked stream. In the conclusion, however, the deed describes the land, generally, as bounded south by Joseph Pound, west by land belonging to the estate of John Vail, deceased, northwest by land now in possession of Benjamin Holmes, *north by Longhill brook,* and east, part by land belonging to John Boyles, and part by Passaic river.

Here, still, is room left for doubt. The Lewis line runs along Vail's line up the brook; the Vail tract, by general description, is bounded north by the brook, but by particular description its north boundary varies from the course of the brook, as it now runs. A strict legal construction would bind both tracts by the particular courses and distances in the deed of Cox to Vail, if there was nothing else in the case; for a particular will control a general description.

Then we are referred to two deeds, one from James Vail to Dr. Hugh McEowen, in 1803, for 126 acres, and the other from Jacob Vail to the same, in 1806, for 72 acres, both of which tracts now belong to the plaintiff. They form part of the tract Vail bought of Cox, as above mentioned; and as these grantors were devisees or grantees of Daniel Vail, it might be supposed they knew where the lines were understood by their ancestors to be.

The deed from Jacob Vail for the 72 acres, which is the tract upon which the trespass is alleged to have been committed, by a manifest mistake in the description of its north line, does not reach even the brook, and we, therefore, derive no aid in solving the question from this deed. That from James Vail for the 126 acres, which is the adjoining tract on the east, describes the north line as bounded by *the brook, the courses thereof,* which would indicate that James understood the Vail line to run along and by the courses of the brook, as contended for by the defendant.

Other deeds are referred to, but the same ambiguity of description exists in them. The deed from Robertson to Gawin McCoy, from whom the Lewis title came, describes the south line as *up the brook generally,* about north, 77 degrees west, 41 chains and 46 links. Gawin McCoy sold the eastern part of this tract to Thomas Lewis, December 20th, 1799, bounding it, as we have seen, along Vail's line *up the brook.* The westerly part he sold to Thomas McCoy, December 20th, 1799, describing his south line as begin-

ning at a corner of land sold by said Gawin McCoy to Thomas Lewis in Vail's line by the brook; thence running north, about seventy-seven degrees west, *up said brook*, seventeen chains and thirty links, to a black-oak bush, for a corner of Vail's land. And when Thomas Lewis sold part of the tract he bought of Gawin McCoy to Daniel Cooper, in 1804, he described its southern boundary, as running north, 77 degrees and 15 minutes west, *up the brook*.

The question, it will be remembered, is whether the brook is the line, or the brush-fence north of the brook. If the brook is the line, the verdict for the defendant is right. If the fence is the line, it is wrong. The defendant having shown title up to the Vail line, he insists that the brook is that line, and that, though courses and distances in the conveyances of the Vail tract are given, which do not correspond with the course of the brook, yet that the language used in most of the deeds indicates that the brook was intended as the line, and was so understood by the parties to these conveyances; and that admitting the principle that the particular will ordinarily control the general description in a deed, yet that fixed monuments will always control courses and distances, and that the brook was intended as the monumental description of the Vails' north boundary.

2. But, in the second place, the defendant relies upon admissions of the plaintiff that the brook was his boundary. William Cory swears that, in the fall of 1855, the plaintiff told him the brook was the line; and John T. Wilcox swears he told him the brook had always been called the line; that the bed of the brook had changed, and that it formerly ran further south. Carl Crue testifies that he, and Cory and Wilcox, talked of buying a white-oak tree of plaintiff, which was over the brook, and the plaintiff expressed himself that it did not belong to him, as the brook was the line. The conversation with Cory and Wilcox took place in reference to a lot of standing

wood they were about purchasing of the plaintiff. There is, also, some evidence that, in 1840, Lewis claimed a tree that had blown down between the brook and the fence, and threatened to sue McEowen if he took it away. Then James M. Lewis testifies that he heard a conversation between his father and Dr. McEowen, the plaintiff's father, when they owned the land, in which Dr. McEowen told Lewis to remember the brook was the line; that old Daniel Cooper had said the brook was the line between him and the Vails; and Israel Vail, one of the sons of old Daniel Vail, and who now owns part of his father's original 430-acre tract, bought of Cox, swears that the brook was always considered the line of the whole tract ever since his knowledge, and that he never heard any dispute about it till ten years ago; and that the brook now runs further north on Lewis than it formerly did.

This was substantially the defendant's case. A surveyor was examined on each side, but the results of their surveys and evidence conflicted; and it is manifest that none of the corners designated by the old deeds could be accurately fixed. It appeared that the actual possession had, for a long period of time, been in accordance with the line of the brush fence; but whether that fence was put there and maintained for mutual convenience only, or as indicating the true boundary, was a matter of debate. The plaintiff neither at the trial nor here, claimed anything by adverse possession merely, but argued, by his counsel, that the existence and maintenance of the fence for so long a time, and the possession of both parties in accordance with it, was persuasive evidence that it was the true line of boundary.

The deed of most importance in this case is that of Phineas Cox to Daniel Vail. It is that to which we look primarily for the Vail line. In describing Vail's north boundary, it begins at a red-oak sapling standing on the bank of Longhill brook, and ends at another red-oak sapling on the same brook, running seven courses from one

point to the other. This deed was made ninety-five years ago. The beginning and ending monuments spoken of are not now distinctly identified ; very probably both are gone. The evidence is, that the brook has changed somewhat since 1762; that it now runs further north ; and we cannot, therefore, know with certainty whether these seven courses given in Cox's deed corresponded with the courses of the brook at that time or not : the inference would seem to be that they did, or were intended so to correspond, from the concluding description of that north line as bounding on the brook. Then, if Vail's north line did bound on the brook in 1762, and the brook now runs further north than it did then, the *locus in quo*, being still north of the brook, would undoubtedly be the defendant's land.

The difficulties in finding the exact lines of so old a survey, where the monuments which marked the corners are gone, or cannot be certainly identified, are known to every surveyor. Daniel Annin, one of the surveyors called, says he does not know of any corner that is certain in the old Cox deed ; and Mr. Lindsley, the other surveyor, bases his survey on what he understood to be a corner admitted by these parties.

Then the fact that Israel Vail, who holds the westerly portion of the original Cox tract, has always held to the brook as his north boundary, and that the easterly portion, sold by James Vail to Dr. McEowen, was expressly bounded on the north by the courses of the brook, taken in connection with Israel Vail's testimony, that he always understood the brook to be the north boundary of the whole of the old Cox tract, go to make up, at least, a plausible case in favor of the defendant's title.

The principal strength of the plaintiff's case rests upon his possession, and the possession of those under whom he holds, to the brush fence. This fence has been there for a long time. But whether it was originally placed, and has been maintained where it now is, north of the brook, under a strict claim of right, or as a matter of convenience

McEowen v. Lewis.

merely, is still an open question. The plaintiff himself makes this the issue. He repudiates any claim of title by adverse possession merely. He says, in substance, if my line is not there by the deeds, I will not have the land. The doctrine of the acquisition of title by adverse possession is not in conflict with sound morals; but courts and juries do well to regard, in questions of this kind, the conscientious scruples of men of high honor and integrity. In this case, if the brook was the line, and yet not wide and deep enough to answer the purpose of a division fence, it became necessary for a fence to be erected and maintained on one side of it or the other. The land-owners would naturally place it where it would be most convenient, and it would not, in such case, be a line of title. True, after so great a lapse of time, and possession held, on each side to the fence, it would raise a presumption that the parties so held in accordance strictly with their titles, which would have to be overcome by evidence on the part of him who denied it. But this necessity is waived by the waiver of any claim by adverse possession.

The question, therefore, here upon the whole case was one of fact for the jury. It was submitted to them under full and proper instructions as to the law. No complaint is made of the charge. It was rather favorable to the plaintiff's side than otherwise; but the judge manifestly considered that a proper case was made for the deliberation of the jury; and we cannot see that he was wrong in doing so. The jury have found for the defendant. Upon a review of the facts, and upon full consideration, we think the verdict ought not to be disturbed, and that the rule to show cause should be discharged.

The CHIEF JUSTICE and ELMER, J., concurred; VREDEN-BURGH, J., dissented.

CITED in *Opdyke v. Stephens, 4 Dutch.* 86.